**SO ORDERED.**

**SIGNED this 07 day of April, 2006.**

_____
**A. Thomas Small**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
FAYETTEVILLE DIVISION

IN RE:                                         CASE NO.

PREFERRED ALTERNATIVES, INC.                   05-03960-8-ATS

      DEBTOR


MEMORANDUM OPINION AND ORDER
REGARDING CONFIRMATION OF PLAN
AND DENYING MOTION TO APPOINT TRUSTEE

The matters before the court are whether to confirm, pursuant to the Bankruptcy Code's "cramdown provision," 11 U.S.C. § 1129(b), the plan of reorganization proposed by the chapter 11 debtors in possession, Preferred Alternatives, Inc. and Preferred Alternatives of Tennessee, Inc.[1] (collectively, "PAI"), over the objection of the Internal Revenue Service and the IRS's motion to appoint a chapter 11 trustee.  A hearing took place in Raleigh, North Carolina on March 23 and 24, 2006.

_____

[1] The cases have been administratively, but not substantively, consolidated.

PAI provides services to individuals with developmental disabilities and mental illnesses. In North Carolina, they provide six categories of services: hospital services, in which PAI employs individuals with a personal history of mental illness and trains them to work with support groups and to provide one-on-one services to other mentally ill individuals with a goal toward preventing re-hospitalization; supported employment, or training individuals to enter the workforce and maintain employment; community integration, or assisting individuals with life skills and gaining independence; residential services, providing 24-hour supervision for people with developmental disabilities; children's services, including teaching children and families adaptive skills; and personal care, in which certified nursing assistants assist individuals with everyday needs including bathing, dressing, housework and grocery shopping. The Tennessee business focuses almost exclusively on residential services. PAI is known for working with clients that other health services companies reject, including those with very difficult behavioral problems and those with "dual diagnoses" of both developmental disabilities and mental illness.

PAI was founded in North Carolina by Neill Guy and James Elliott, Ph.D. in 1997, while PAI Tennessee was incorporated in 2000. Mr. Guy owns a 40% share of the North Carolina corporation and a 36% share of the Tennessee corporation. Mr. Guy's father, Samuel Guy, owns a 20%

2

share of the North Carolina corporation and an 18% share of the Tennessee corporation.  Dr. Elliott owns a 40% share of the North Carolina corporation and a 36% share of the Tennessee corporation. Carl Noyes owns a 10% share of the Tennessee corporation.  On the filing date, these four individuals were also the officers and board of directors of PAI.

PAI began with approximately 10 employees, and now has over 900 employees in two states.  Unfortunately, while the company grew exponentially, its management and corporate operations did not.  PAI lacked financial policies and controls, lacked any accounting personnel with the experience to operate a large company, and had no methods for determining what aspects of its business were profitable and what services were losing money.  The issue came to a head in 2005, when an employee came to Mr. Guy with a question about withholding taxes and Mr. Guy discovered that no payroll taxes had been paid by PAI for approximately 5 years.

Upon this discovery, Mr. Guy immediately consulted with a tax attorney and PAI reported its failure to file to the IRS.  PAI then filed its chapter 11 petition to devise a plan to repay the approximately $12 million owed in priority taxes.  Since filing, PAI has retained outside accountants, the Adams Martin firm, to help put new accounting procedures and software in place, to reconstruct past accounting information and file the payroll tax returns, to prepare

monthly reports as required by this court, and to interview candidates for the position of controller. Adams Martin did interview candidates and recommended that PAI hire James "Butch" Wilson. Mr. Wilson has substantial accounting experience in the health care industry and has overseen the financial turnaround of at least one health care company. See Ex. 1.

PAI followed its accountants' recommendation and hired Mr. Wilson. Not only did PAI retain Mr. Wilson as its controller, but it hired him as its president. In March 2006, Mr. Wilson also replaced Mr. Guy as Chairman of the Board. Since joining PAI, Mr. Wilson has continued the work begun by Adams Martin, implementing new accounting procedures and overseeing all aspects of the company's financial management. PAI has filed its prepetition payroll tax returns, made all postpetition tax payments, filed all postpetition tax returns, filed all monthly reports due to this court, and paid all quarterly fees due to this court. In addition, Mr. Guy has prepared and filed the prepetition corporate income tax returns.

PAI and PAI of Tennessee filed two separate plans of reorganization, though they differ only with respect to the monthly payment amounts provided in Class 2 and PAI of Tennessee's treatment of Class 3. Accordingly, the following discussion of the plans is directed to both plans unless otherwise specified. The debtors have

received the requisite acceptances of the plan, with the exception of the IRS.

Class 1 is the administrative claims that will be paid in full on the effective date or within 10 days after the claims are allowed. This class is estimated to include approximately $50,000 in attorney's fees. Other administrative claims, including those of the Adams Martin firm, have been paid during the course of the chapter 11 proceeding as allowed by the court.

Class 2 includes the allowed claims of the IRS, which are to be paid in full within six years of the date of assessment, on the following schedule:

```
For PAI of North Carolina:

November 1 and December 1, 2006:  $ 5,000
1st day of each month during 2007:$10,000
1st day of each month during 2008:$20,000
1st day of each month during 2009:$40,000
1st day of each month during 2010:$60,000

For PAI of Tennessee:

July 1, 2006                           $ 6,250
1st day of each month during 2006 thereafter: $ 6,250
1st day of each month during 2007:$30,000
1st day of each month during 2008:$40,000
1st day of each month during 2009:$60,000
1st day of each month during 2007:$90,000
```

In addition to the monthly payments, PAI proposes to make annual payments to the IRS beginning on April 15, 2007, and each year on the anniversary, including 2010, of 50% of its net distributable income.

5

Finally, PAI proposes a lump sum payment of the balance to be paid on May 31, 2011.

Class 3 includes the other priority claims. PAI of North Carolina will pay these claims in full within 90 days of the effective date. Class 3 voted in favor of the plan in North Carolina. PAI of Tennessee will pay these claims in full on the effective date, so Class 3 is unimpaired in the PAI of Tennessee plan and no ballot is necessary. Class 4 includes secured claims held by RBC Centura. PAI proposes to add any arrears to the end of the regularly scheduled payments, and RBC Centura accepted this treatment. Class 5 includes general unsecured claims, which are to be paid in full within 180 days of the effective date. PAI noted at the hearing that while this class is relatively small, if the plan is not confirmed, there will be numerous lease rejection claims that would be added to the general unsecured claims. Class 5 voted in favor of the plan.[2] Finally, Class 6 provides that the shareholders will retain their interests in the debtor.

In addition to the class treatment, the plans provide, at the option of the IRS, for the retention of an attorney unrelated to the debtors to investigate and, if the attorney deems it advisable, to

---

[2] The only ballot against the plan, other than the rejection by the IRS, was filed by North State Communications, which was scheduled with a claim of $0 and has not filed a proof of claim nor did it indicate an amount for its claim on its ballot. Accordingly, all impaired creditors holding legitimate claims, with the exception of the IRS, have voted in favor of the plans.

6

bring actions against insiders as an additional source of funds for payment to creditors. At the confirmation hearing, PAI proposed an amendment to provide for the liquidation of the debtor should the debtor fail to make any payment due to the Class 2 claimants under the plan, should the debtor fail to file any federal tax return due postconfirmation, and should the debtor fail to pay any federal tax due postconfirmation when due.

The IRS vehemently opposes confirmation and contends that a chapter 11 trustee should be appointed to begin liquidating the debtor immediately. The IRS contends that PAI should not be allowed to stair-step its payments to the IRS with a balloon payment at the end of the statutory six-year repayment period. The IRS also contends that the plan is not feasible, and that it is designed to delay an inevitable sale, rather than to reorganize. The IRS also contends that the plan is not fair and equitable as required to confirm the plan over its objection pursuant to § 1129(b)(1). Finally, the IRS opposes any plan modifications proposed at the confirmation hearing.

**Modification of Plan Procedure**

The debtor submitted an amended order confirming plan at the opening of the confirmation hearing, and advised the court during its closing argument of further modifications it would make to add protections to the IRS. The IRS opposes any such modifications.

As discussed in this court's opinion in <u>In re Accu-Fab</u>, Case No. 04-00651-5-ATS (Bankr. E.D.N.C. Oct. 27, 2004), this court has, for many years, permitted debtors to make oral modifications to their plans at confirmation hearings as part of the court's small business fast-track procedures. "The modifications, if approved, are incorporated into the order confirming the plan. The court is always careful to protect the due process rights of any creditor affected by any oral modification." <u>Accu-Fab</u> at 9. In this case, like in <u>Accu-Fab</u>, the IRS's due process rights have not been denied. The court heard two days of testimony and is well-informed concerning the contentions of each party. In addition, the IRS has been given additional time to craft its own language regarding the liquidation provisions to address some of its concerns regarding the modifications (as discussed below). Accordingly, the court will not deny the modifications on the basis that they were submitted at the confirmation hearing.

**Feasibility**

The debtor's most difficult hurdle is to show that its plan is feasible, and evaluation of other confirmation requirements also turns on the analysis of the same facts. As noted above, the plans provide for monthly payments to the IRS, with annual payments based on net distributable income and a balloon payment in 2011. The IRS contends that the debtor simply will not be able to make even the monthly

8

payments, and that if it does, it will only have paid down interest and will still have an enormous balloon payment due in May 2011.

As the court discussed in <u>Accu-Fab</u>, "a chapter 11 plan proponent need only demonstrate that '[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.'" <u>Accu-Fab</u> at 14 (citing § 1129(a)(11); <u>In re Grandfather Mountain Ltd. Partnership</u>, 207 B.R. 475 (Bankr. M.D.N.C. 1996); <u>In re Beare Co.</u>, 177 B.R. 886 (Bankr. W.D. Tenn. 1994); <u>In re Harbour Pointe Assoc. Ltd. Partnership</u>, Case No. 92-00033-5-ATS (Bankr. E.D.N.C. Feb. 18, 1993)). With its modification, the debtor's proposed plan does propose that if payments are not made or there are other defaults, the debtor's assets will be liquidated. "Although a chapter 11 debtor need not show that all payments will be made, the debtor must demonstrate that there is a reasonable prospect that the reorganization will be successful." <u>Accu-Fab</u> at 15 (citation omitted).

**Monthly and Annual Payments**

The debtor's evidence of its ability to make the required plan payment hinges entirely on projections prepared by Mr. Wilson. Mr. Wilson joined PAI on October 27, 2005. Prior to that time, there were no reliable historical financial records due to the debtor's failure to have in place a comprehensive accounting system while it grew to over

900 employees.  Accordingly, Mr. Wilson took the actual revenue and expenses from October and November 2005 and prepared a five-year projection based on those numbers.  Exs. 3, 3A, 3B.  Mr. Wilson assumed 10% growth each year, and added a 6% increase in personnel-related expenses per year and a 3% annual increase in other expenses, based on the likely inflation rate.  Mr. Wilson used the current client authorizations, with a 95% utilization rate in Tennessee and a 90% utilization rate in North Carolina, and he did not assume any increase in reimbursement rates.  Ex. 4.

Of course it would be preferable to have projections based on more than two months' actual data.  However, this debtor has spent its chapter 11 case putting accounting procedures in place, determining where it was losing money, cutting out unprofitable contracts, and better controlling its spending across its offices.  The costs associated with the Adams Martin firm's work have been enormous.  Had the confirmation hearing been delayed by several months, Mr. Wilson could have compiled projections based on additional data.  The debtor should not be penalized for its efforts to have its plan confirmed sooner rather than later because its data shows the costs, but not necessarily the benefits, of its work early in the case.

In addition, the court finds the projections to be reasonable. Even if the 10% growth rate is optimistic, the projections do not account for substantial rate increases that have already occurred, nor

10

do they account for expenses that have already been reduced.[3]  In the
past, PAI has grown much more than 10% per year, but as Mr. Wilson
testified, that growth was not well-managed and the expenses grew at an
equal rate or more.  It is Mr. Wilson's intent, as the leader of the
company, to limit the growth to 10 percent, as well as to have the
managers of each local office of the company become more directly
active in the financial performance of the company (he called them
"mini-CEOs").  Finally, Mr. Wilson, Dr. Elliott and Mr. Noyes all
testified unequivocally that they believe PAI will be able to meet the
projections.

Mr. Wilson's projections show that the debtor will be able to make
the required monthly payments under the plan, and that each year there
will be sufficient net cash flow to fund the annual payments to the
IRS.  In fact, his projections are such that the tax liability will be
nearly paid at the end of 2010, so that the balloon payment will be
minimal.  If no annual payments are made, however, the remaining tax
liability in May 2011 will be close to $12 million, and the debtor's
ability to make that payment is the subject of the debtor's expert's
testimony, discussed below.

---

[3] There was substantial testimony about a change in the law that
went into effect on March 20, 2006, effectively tripling the rate for
many of PAI's services in North Carolina, as well as starting
reimbursement for certain services that were previously unbillable.  In
addition, Mr. Wilson testified about over $300,000 in expenses that
have recently been eliminated on an annual basis.

The court does have some concerns about whether the debtor will be able to meet its projections, and thus the court will require greater oversight and reporting than is usually necessary postconfirmation. The specific requirements are fully set forth in the latter part of this opinion, and shall be incorporated into the Order Confirming Plan. With this higher scrutiny, the court finds that the debtor has met its burden of showing feasibility with respect to the monthly payments and the likelihood of making significant annual payments.

**Balloon Payment and <u>Daubert</u> Analysis**

With respect to the debtor's ability to make the balloon payment in May 2011, the decision turns on whether the value of the debtor in 2011 will be such that it could refinance or liquidate for an amount sufficient to pay the balance of the IRS claim in full. In support of its plan, the debtor presented the testimony of James B. Lurie as an expert on business valuation. Mr. Lurie prepared a report setting forth his assumptions and hypotheses, and reached a conclusion about the value of PAI in December 2005 and the prospective value of PAI in December 2010. The IRS objected to the admission of Mr. Lurie's testimony and report, contending that the valuation evidence is not reliable or based on sound methodology.

Rule 702 of the Federal Rules of Evidence provides that expert testimony is admissible if offered by "a witness qualified as an expert

12

by knowledge, skill, experience, training, or education," and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.  The rule was revised in 2000 in response to the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  See Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendments; see also United States v. Parra, 402 F.3d 752, 758 (7th Cir. 2005).

Daubert set forth a list of factors for a court to consider conducting a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 593, 113 S. Ct. at 2796.  Because of the amendments to Rule 702, "the Daubert factors do not have to be 'met' before expert testimony can be found reliable," though "many cases rely on the Daubert factors as evidence of the three new criteria in Rule 702." Huber v. JLG Industries, Inc., 344 F. Supp. 2d 769, 773 (D. Mass. 2003).

Because the Daubert factors are helpful in assessing whether evidence complies with Rule 702, the court will take them into consideration.  Those factors include

- whether a theory or technique can be (and has been) tested;

- whether the theory or technique has been subjected to peer review and publication;
- the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and
- identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community.

See Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2796-97. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595, 113 S. Ct. at 2797. In addition to the Daubert factors, the court is to consider "a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." Parra, 402 F.3d at 758 (citations omitted).

Mr. Lurie is a certified public accountant, a certified business appraiser, and a certified valuation analyst, and is a member of at least six professional associations for accountants, appraisers, and valuation analysts. Mr. Lurie has worked in the financial industry since 1973, and has experience in restructuring, capital management, insolvency analysis, valuation, corporate planning and asset recovery. Mr. Lurie has focused on business valuation since 1993, and has published extensively on valuation and appraisals. See generally Ex. 12 at 60-63.

Mr. Lurie prepared an opinion of fair market value of PAI in conformance with the standards set forth in the Uniform Standards of

14

Professional Appraisal Practice, 2005 edition ("USPAP").[4] For purposes of appraising PAI, Mr. Lurie treated the two separate legal entities, PAI and PAI of Tennessee, as one operating unit, and stated that this treatment constitutes a Hypothetical Condition as defined by USPAP.[5] Ex. 12 at 9.  Mr. Lurie relied upon "information, estimates, and assumptions . . . obtained from the management of the Debtors, [their] representatives, and other sources considered to be reliable.  The accuracy of that information and the assumptions was not independently verified."  Ex. 12 at 12.  In addition, Mr. Lurie set forth the following "Extraordinary Assumptions:"[6]

---

[4] The USPAP is published by The Appraisal Foundation.  According to its website at www.appraisalfoundation.org, "The Financial Institutions Reform, Recovery and Enforcement Act of 1989 recognizes USPAP as the generally accepted appraisal standards and requires USPAP compliance for appraisers in federally related transactions. State Appraiser Certification and Licensing Boards; federal, state, and local agencies, appraisal services; and appraisal trade associations require compliance with USPAP."

[5] USPAP defines a Hypothetical Condition as "that which is contrary to what exists but is supposed for the purpose of analysis. Comment: Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

[6] "Extraordinary Assumption" is a term of art defined by USPAP as "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Comment: Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."  Mr. Lurie testified that the Extraordinary Assumptions used

15

> We have reviewed and accepted as reasonable the operating projections of management of the Debtors. While we have challenged certain of management's assumptions underlying those projections, we have not reviewed them in light of historic financial data, which does not exist in reliable form. We have not audited, reviewed or compiled those projections in accordance with the relevant pronouncement of the American Institue of Certified Public Accountants, and we express no opinion or any other form of assurance with respect to those projections. Our acceptance of those projections, and their utilization as a basis for additional analysis by us, constitutes an Extraordinary Assumption under USPAP.
>
> This valuation assumes that general economic and market conditions prevailing at December 31, 2005 will approximate those at December 31, 2010. This assumption constitutes an Extraordinary Assumption under USPAP.

Ex. 12 at 12-13. Finally, Mr. Lurie's opinion is based on the assumptions of "willing seller, lack of compulsion, and reasonable marketplace exposure implicit within the definition of Fair Market Value." Ex. 12 at 42.

Mr. Lurie used three methods to determine the value of PAI: one for the value as of December 31, 2005, and two for the projected value as of December 31, 2010. Those methods are the Discounted Future Returns method (for 2005), the Single Period Capitalization method (for 2010), and the Guideline Public Company method (for 2010). Mr. Lurie specifically rejected other methods, including the Guideline Transaction and Direct Market Data methods due to "an insufficient number of reliable transactions to provide a reliable base for

in his analysis were really "ordinary extraordinary assumptions."

analysis," and several asset-based approaches due to the substantially intangible nature of the debtors' business. Ex. 12 at 40. Mr. Lurie's report walks through the calculations and methodology in detail, and his appendices set forth his calculation of discount rates, capitalization rates, and present value factors.

Mr. Lurie's three methods for valuing PAI, the Discounted Future Returns method, the Single Period Capitalization method, and the Guideline Public Company method, are well accepted practices for business appraisers. These methods have been peer reviewed and there are numerous publications explaining their use. As Mr. Lurie testified, the methods are arithmetical; to the extent underlying numbers change, the calculations would be reworked and the conclusion would similarly be revised. In sum, the court finds that the methodology chosen by Mr. Lurie meets the <u>Daubert</u> factors, and the methodology is reliable.

Turning to the elements of Rule 702, Mr. Lurie is clearly qualified to testify as an expert by knowledge, skill, experience, training and education. His testimony is based upon sufficient facts or data, as explained in the discussion in this opinion of Mr. Wilson's projections. Mr. Lurie's testimony is the product of reliable principles and methods, and Mr. Lurie has applied the valuation methodology reliably to the facts in this case.

Mr. Lurie's report clearly sets forth the hypotheses and assumptions made. He acknowledges that his valuation is based entirely on the projections provided by PAI, after Mr. Lurie challenged PAI on those projections. It is evident to the court that the expert opinion on value is only as good as the information on which it is based: the valuation methodology is the industry standard. If the projections are good, the valuation is good. If the projections have no validity, by extension the valuation is invalid. But any invalidation of the expert opinion is not due to Mr. Lurie's methods, and the court is able to assess the credibility of the conclusion in connection with its evaluation of the credibility of the underlying data. Accordingly, the court sees no reason to exclude the testimony and report of Mr. Lurie under Rule 702 or <u>Daubert</u>.

Because the court has found Mr. Wilson's projections to be reasonable, the court will consider Mr. Lurie's opinions on value. Mr. Lurie concluded that the value of PAI in December 2005 was $4,240,000. Ex. 12 at 42. He projects that its value in December 2010 will be $17,700,000 (Mr. Lurie's report shows a value of $18,550,000, but he modified this value at the hearing). Ex. 12 at 49, as supplemented by testimony. The value in 2010 will be more than sufficient to pay any balloon payment required to pay the IRS in full.

18

**Liquidation Provision**

As noted above, the definition of feasibility in chapter 11 includes the requirement that confirmation is not likely to be followed by liquidation, unless liquidation is contemplated in the plan. The debtor's proposed plan does provide that if payments are not made or there are other defaults, the debtor's assets will be liquidated. After receiving post-hearing suggestions from the parties, the court has determined that additional liquidation provisions should be incorporated into the Order Confirming Plan, and those provisions are set forth later in this opinion.

The IRS contends that merely adding a provision that says the debtor will liquidate if it defaults is not sufficient. In support of its position, the IRS cites In re Danny Thomas Properties L.P., 241 F.3d 959 (8th Cir. 2001). While Danny Thomas does hold that providing for liquidation in the event of a default in a reorganization plan cannot render a plan feasible as a matter of law, that case and those cited therein were real estate cases addressing the claims of secured creditors. The Danny Thomas court specifically noted that the value of the real estate was decreasing, and that execution of the "drop dead" provisions in the plan would not fully satisfy the secured claim. 241 F.3d at 964-65.

In this case, the debtor's value is as a going concern. If it were liquidated today, the IRS would not get paid in full; in fact, it

19

would receive very little of its priority claim. With each month that PAI continues to operate under the new controls imposed by Mr. Wilson, it increases in value. Thus, even if the debtor defaults on its payments and the liquidation clause is triggered in one year, the IRS will be paid <u>more</u> than if the debtor is liquidated today.

In summary, the court finds that the plan is feasible. The debtor has made great strides in establishing internal controls and procedures, it has a new president and chairman of the board who is focused on a successful reorganization, the entire management team is committed to repaying the IRS, and the company fills a unique niche within its industry that is recognized by its clients. The court finds there is a reasonable prospect that the plan will be successful, and in any event, if it is not successful, the plan provides for liquidation of the debtor's assets.

**Good Faith**

The IRS contends that the plan is not proposed in good faith. The court disagrees. While the debtor's predicament is the result of mismanagement, it has made tremendous efforts to turn itself around and proposes to pay the IRS in full within 6 years. All of the debtor's witnesses testified that they believe the projections can be met and that the IRS will be paid in full. The debtor has expressed a willingness to do whatever the court requires to show its good faith, including adding a provision to the by-laws that prevents Mr. Guy from

regaining his seat on the board of directors until after the IRS is paid in full.  The court simply does not find any evidence of bad faith.

**Section 1129(a)(9)**

The IRS contends that the debtor must make equal monthly payments to the IRS, rather than stepped payments with a balloon at the end. While the IRS may find support for this proposition in the Bankruptcy Abuse Protection and Consumer Protection Act of 2005,[7] that Act was not in effect when this case was filed, and the controlling law does not require equal monthly payments.

In fact, the applicable § 1129(a)(9) requires only that the payment be made in "deferred cash payments over a period not exceeding six years after the date of assessment . . . ."  11 U.S.C. § 1129(a)(9).  It is better to read this flexible provision to allow the plan to propose payments that the debtor will actually be able to make, rather than to guarantee failure by reading a requirement into the statute that simply does not exist.

**Fair and Equitable**

The IRS contends that the treatment proposed by the debtor is not fair and equitable to the IRS as required for "cramdown" under § 1129(b).  The debtor questions whether § 1129(b) actually applies to

---

[7] The debtor contends that even BAPCPA does not require <u>equal</u> monthly installments.  The court does not express an opinion on the requirements of the new law.

21

the IRS's claim, citing to <u>In re Gregory Boat Co.</u>, 144 B.R. 361 (Bankr. E.D. Mich. 1992).  The <u>Gregory Boat</u> court determined that the taxing authorities are not a proper "class" under § 1123(a)(1), and thus they are not an impaired class that has not accepted the plan.  Without an impaired class that has not accepted the plan, § 1129(b) does not apply.

Without reaching the issue of whether § 1129(b) applies in this case, the court finds that the treatment is fair and equitable to the IRS.  The debtor has dedicated new management in place, and proposes to pay the IRS in full as required by the Code.  The court will impose heightened reporting requirements for the debtor and will exercise careful oversight of its progress.  Specific liquidation provisions, should the debtor default, have been enhanced, and the debtor has set forth a mechanism for actions against insiders to be investigated and pursued.  In short, procedures have been incorporated into this plan to ensure that the IRS is paid in full, and the plan meets the requirements of § 1129(b).

**Interest Rate**

The debtor proposes to pay the IRS back at the statutory interest rate (which was 6% at the time the debtor filed its plan, but has since increased to 7%).  The IRS contends that the rate should be 10% under <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465, 124 S. Ct. 1951 (2004), contending that the risk factor in this case is substantial.  The

22

debtor's proposal meets the statutory requirements, and the risk is addressed by the provisions for immediate appointment of a liquidating agent or conversion should the debtor default on a single payment to the IRS.  Accordingly, the statutory interest rate is the appropriate rate.

**Required Terms**

At the conclusion of the hearing, the court gave the IRS the opportunity to suggest language regarding the liquidation provisions and reporting requirements that should be incorporated into the Order Confirming Plan.  Both the IRS and the debtor submitted proposed orders of confirmation.[8]  The court has considered the submissions, and finds that the following terms should be included in the orders of confirmation:

<u>Additional Reporting Requirements</u>.  The debtor shall provide the IRS with copies of all reports required to be filed or provided to the bankruptcy administrator after confirmation.  In addition, beginning on June 30, 2006, and on each September 30, December 31, March 31, and June 30 thereafter until Class 2 is paid in full, the debtor shall provide the IRS with Financial Statements compiled by a CPA. Additionally, the debtor shall submit audited financial statements to the IRS on May 31 of each year until Class 2 is paid in full, with the

---

[8] The IRS continues to maintain that the plans are not confirmable and opposes confirmation.  The submission of proposed language is not a waiver of the IRS's continuing objections.

23

first such annual audit being for calendar year 2006, due on May 31, 2007.

Liquidation Triggering Event.  Any of the following shall constitute a Liquidation Triggering Event:

    1. The failure by the debtor to make any payment due to Class 2 claimants under the plan;

    2. The failure by the debtor to file any federal tax return due postconfirmation when due (including extensions);

    3. The failure by the debtor to pay any federal tax due postconfirmation when due; and

    4. A determination by this court (which shall have exclusive jurisdiction to make such determination), after notice and a hearing, that the debtor has suffered a material and significant adverse change in financial condition that materially and significantly impacts the feasibility of the debtor's plan such that it is in the best interests of the debtor's then-existing creditors that the debtor be liquidated.

Liquidation Process.  In the event that any party gives notice to the debtor of a Liquidation Triggering Event and the debtor does not correct the failure that constituted the Liquidation Triggering Event (by making the payment to the Class 2 claimant, by filing the tax return or obtaining an extension, or by paying the tax in question) within 10 business days of the debtor's receipt of the notice, then the court will promptly appoint a liquidating agent and vest that liquidating agent with all necessary powers to complete the liquidation, or, alternatively, the case shall be converted to chapter 7.  If the debtor disputes the occurrence of a Liquidation Triggering Event, then the debtor may seek an expedited hearing on that issue.

24

In the event a liquidating agent is appointed or the case is converted to chapter 7 and a trustee appointed, the liquidating agent or chapter 7 trustee may continue to operate the debtor until the debtor's assets may be sold in a manner to maximize the remaining value of the estate.

<u>Limitations on Transfers</u>. The debtor shall not (a) sell any assets with a fair market value exceeding $20,000, (b) borrow any funds on a secured basis (except purchase money security interests secured only by the asset purchased), or (c) take any action outside the ordinary course of business without the consent of the IRS. Should the IRS refuse its consent, the debtor may reopen this case and seek authorization from the court. For purposes of this paragraph, entering leases, buying and selling vehicles, hiring and firing employees, terminating unprofitable contracts, and entering new contracts are considered to be within the ordinary course of business. Also for purposes of this paragraph, transferring entire categories of services or all services within a geographical area to other health care providers are considered to be outside the ordinary course of business.

<u>Retention of Jurisdiction</u>. This court shall exercise exclusive jurisdiction over the debtor's plan, the debtor's property, and the claim of the IRS until such time as all allowed claims of the IRS are paid in full. Additionally, the court shall retain jurisdiction of this case to require the performance of any act that is necessary for

the consummation of the plan including, without limitation, the jurisdiction to hear and to determine all claims against the debtor and to enforce all causes of action that may exist in the debtor's favor and to modify the plan pursuant to the provisions of § 1127 of the Bankruptcy Code.  In the event an appeal is perfected from the order confirming the plan, the court also retains jurisdiction to enter such orders regarding the disbursement of funds under the plan or the consummation thereof as may be necessary to protect the interests of the debtor, its creditors, and other parties in interest. Specifically, the court will retain jurisdiction for the following purposes:

> (i)   Determination of the allowability of claims upon objection to such claim by the debtor or any other party in interest.
>
> (ii)  Determination of the request for professional fees under § 330 of the Code incurred prior to the confirmation of the plan.
>
> (iii) Resolution of any disputes regarding the interpretation of the plan.
>
> (iv)  Implementation of the provisions of the plan and entry of any order in aid of consummation of the plan, including, without limitation, appropriate orders to protect the debtor from creditor action.
>
> (v)   Modification of the plan pursuant to § 1127 of the Code.
>
> (vi)  Adjudication of any causes of action, including transfer avoidance actions, insider actions, and adversary proceedings under the Code.
>
> (vii) Entry of a final decree.
>
> (viii) Adjudication of any liability of any party arising out of or relating to the plan.
>
> (ix)  All other matters properly before the court by provision of the Code or Bankruptcy Rules.

With these heightened reporting requirements and liquidation provisions, the court concludes that the debtor's plan is confirmable and confirmation will be **ALLOWED**, and the IRS's motion to appoint a trustee is **DENIED**.  The debtor shall submit a proposed Order Confirming Plan in each case within 15 days of the date of this memorandum opinion, incorporating the terms as set forth herein.

**SO ORDERED**.

**END OF DOCUMENT**